Civil action to recover a balance of $39,424.04, alleged to be due under contract.
Before the trial below, a voluntary nonsuit was taken as to the defendant, N.C. Cotton Growers Cooperative Association.
J. J. Whitehurst, one of the plaintiffs, on 30 May, 1941, executed a Marketing Agreement, as follows:
 "MARKETING AGREEMENT FOR FCX FRUIT AND VEGETABLE SERVICE, INC.
"The undersigned grower, hereinafter referred to as the Grower, agrees to deliver to FCX Fruit Vegetable Service, Inc., hereinafter referred to as the Cooperative, the Irish potatoes produced by the Grower for sale during the five year period 1940-1944 inclusive, subject to cancellation any year by written notice to the Cooperative during the month of January of such year.
"Annual cancellation privileges are applicable to both the Grower and the Cooperative.
"The Irish potatoes delivered by the Grower to the Cooperative are to be handled in accordance with the By-Laws of the Cooperative and other rules and regulations established by the Cooperative. If the Grower is not already a member of the Cooperative, he agrees to pay $2.00 as membership fee in the Cooperative. If, at the time the potatoes are ready for marketing, the Grower can sell same at a price greater than the amount that it appears he can obtain for the same through the Cooperative, the Grower can sell his potatoes to or through other persons, provided he pays to the Cooperative an amount equal to one cent per bag or one and one-half cents per barrel for all potatoes sold by the Grower to or through persons other than the Cooperative; and the Grower hereby agrees to make such payment to the Cooperative for all potatoes sold to or through other persons in order to help pay the expenses that might be incurred by the Cooperative in arranging for the services provided in this and similar agreements with other growers, said payment to be made by the undersigned Grower immediately upon his selling any Irish potatoes to or through any person other than the Cooperative.
"This instrument contains all of the conditions and terms of the agreement between the parties hereto and cannot be amended or changed except by a paper writing signed by both parties. *Page 630 
"The Grower, upon request of the Cooperative, agrees to furnish the Cooperative with the actual number of acres planted in Irish potatoes each year that this contract is in effect.
 "Read and signed by the Grower on 30 day of May, 1941. J. J. WHITEHURST (SEAL), Grower, P. O. Address — Mt. Olive, N.C.
"Witness: C. C. HILTON.
 "Executed by the Cooperative on ....... day of ......., 19........ FCX FRUIT VEGETABLE SERVICE, INC., by M. G. Mann, (s) Secretary."
During the seasons of 1941 and 1942, Whitehurst marketed potatoes under the above agreement.
On or about 16 April, 1943, J. J. Whitehurst executed the following contract:
"MARKETING SALES AGREEMENT.
"The undersigned Grower, hereinafter referred to as the Grower, and the FCX Fruit Vegetable Service, Inc., hereinafter referred to as the Cooperative, enter into the following sales Agreement:
"The Grower agrees to deliver to the Cooperative the first 50 cars of U.S. No. 1 Irish Cobbler Potatoes grown or handled by him during the 1943 marketing season. The potatoes to be Federal and State inspected with inspection certificate reading fairly clean, grade defects within tolerance, and showing not over 1/2 of 1% decay. The potatoes to be packed in new burlap, cotton, or mesh bags, branded or properly tagged, and to be loaded and stacked with the proper care in refrigerator cars containing 300 bags to the car on or before June 20, 1943.
"Upon delivery of the inspection certificate and bill of lading to the Cooperative, in accordance with the above conditions, the Cooperative agrees to pay the Grower on an f.o.b. acceptance basis the Eastern North Carolina OPA established ceiling price of $2.40 cents per bag that has been established for U.S. No. 1 Cobbler potatoes, less the Cooperative's marketing service charge of .05 cents per bag, payment to be made by check from the Cooperative's office at Washington, North Carolina.
"In event the ceiling price of U.S. No. 1 Cobbler potatoes is raised or lowered, the Cooperative will pay the Grower the ceiling price in effect at time of shipment with the Cooperative's marketing service charge remaining at .05 cents per bag.
"The Grower agrees to furnish the Cooperative with the car numbers and dates that each car is ready for shipment immediately upon completion *Page 631 
of the loading and inspection thereof, and further agrees to make shipment to any destination requested by the Cooperative.
"This agreement entered into under seal on this 16th day of April, 1943.
 (Signed) FCX FRUIT VEG. SERVICE (SEAL) By C. C. HILTON.
 "Signed: J. J. WHITEHURST (SEAL)."
It is alleged that in the execution of the foregoing agreement, J. J. Whitehurst was acting for himself and his co-plaintiff, James H. Reaves.
The plaintiffs allege that the FCX Fruit Vegetable Service, Inc., in the execution of the contract, dated 16 April, 1943, was acting as agent for itself and its co-defendant, and that the defendants are jointly liable to the plaintiff for the contract price of said potatoes.
The plaintiffs allege they shipped 86 carloads of potatoes, pursuant to the 1943 agreement, and allege that the defendants purchased 83 cars of said potatoes at $2.84 per bag and 3 cars at $2.40 per bag, less a deduction of $15.00 per car by the defendants for handling charges.
The defendants allege that only three cars of potatoes were delivered under the 1943 agreement, on or before 20 June, 1943, and that all the potatoes handled by the defendant FCX Fruit Vegetable Service, Inc., for J. J. Whitehurst, over and above the aforesaid three cars, were handled in strict compliance with the Marketing Agreement executed in 1941.
The defendants further allege that the FCX Fruit Vegetable Service, Inc., is a separate and distinct corporation from the defendant, Farmers Cooperative Exchange, and was organized for the specific purpose of aiding and assisting growers of Eastern North Carolina in the marketing of their Irish potatoes, and that its co-defendant is in no way connected with the defendant, FCX Fruit Vegetable Service, Inc.
The pertinent part of the testimony is as follows:
1. That after Whitehurst received the proposed agreement, dated 16 April, 1943, and before the execution thereof, Whitehurst and Reaves entered into a partnership agreement to handle potatoes during the 1943 season.
2. That the potato crop in 1943 was late, on account of a freeze which occurred about 20 April, and because of the lateness of the crop, the plaintiffs, Whitehurst and Reaves, on or about 8 June, 1943, made a trip to Washington, North Carolina, to see C. C. Hilton, Director-Manager of the FCX Fruit Vegetable Service, Inc., about the delivery of potatoes under their contract. Whitehurst testified: "We discussed the lateness of the crop with Mr. Hilton and he told us the potato *Page 632 
crop was late in general over the belt and he didn't see as that would make much difference, that he had to take care of his customers, especially last year when it was seller's market instead of buyer's market, said `We might need him later on another year.' Mr. Reaves asked him before we left about the size and grade of the potatoes and the extent they would take Victory grade, and maybe a car or two of Victory grade had moved from the Mt. Olive section, and his answer was that others took them and they would have to do likewise."
Mr. Reaves testified: "About 8th June, before any potatoes were purchased by us or any potatoes were delivered to FCX, Mr. Whitehurst and myself went to Washington, North Carolina, to Mr. Hilton's office. The sole purpose of our visit was to find out how we stood on the contract. Since there had been a frost, we knew we could not fill the contract by the date limit, and we talked to Mr. Hilton, and during the conversation we told him there was no way we could fill the contract by 20th June, and wanted to know just where we stood on it, and Mr. Hilton's answer to that was that he wanted the potatoes, and it would be no penalty to them to have them late, as the whole section was late, and he wanted every potato that we would let him have, and that his Board of Directors had authorized and directed him to get potatoes to protect their trade during 1943; that it was the seller's year, and if he let the trade get away from him, when it got to be the buyer's year again, that they would go to the same place they got them in 1943, and that he would reduce the charge from five cents to four cents per bag on the potatoes we shipped him, making them net $2.80 per bag. . . . I told Mr. Hilton that they were loading potatoes in Mt. Olive under what they called the Victory grade, and Victory grade is field run. I told him I had 135 bags planted myself, and was seriously considering digging them right away while I could move my potatoes under the Victory grade and asked him if he wanted them if I did and he said `Yes.' He said, `Since others were taking them that way he would take them.' He stated to us that he would give $2.84 less his charge for Victory grade potatoes." The plaintiff Reaves further testified to the effect that he and Whitehurst had previously dealt with Mr. Hilton, as Manager of Farmers Cooperative Exchange; that they had bought a truck load of seed potatoes the spring before, and Mr. Whitehurst issued his check in the sum of $294.25, payable to Farmers Cooperative Exchange, and that he (Reaves) delivered the check to Mr. Hilton in Greenville, N.C. and Mr. Hilton delivered the seed potatoes to Mr. Whitehurst. Mr. Whitehurst corroborated this testimony, and testified further that he had made payments of money to Mr. Hilton for the Farmers Cooperative Exchange, that Mr. Hilton fixed the prices on goods or merchandise sold to him by the Farmers Cooperative Exchange, *Page 633 
that Mr. Hilton wrote him letters on the stationery of the Farmers Cooperative Exchange, that the letter transmitting the 1943 contract was written on such stationery from Greenville, N.C. and that each envelope containing invoices and bills of lading covering the 86 cars of potatoes shipped during the 1943 season was addressed to the Farmers Cooperative Exchange, Washington, N.C.
3. The ceiling price was $2.70 to the grower and $2.84 to the buyer per hundred pounds for U.S. No. 1 Irish Cobbler potatoes from 16 June through 26 June, 1943, inclusive. During the aforesaid period the plaintiffs shipped 86 carloads of Irish potatoes to consignees designated by Mr. Hilton or Mr. Pendulik, an employee of the FCX Fruit Vegetable Service, Inc., according to plaintiff's testimony. Each car contained 300 bags of Irish potatoes, weighing 100 pounds per bag. The potatoes were officially inspected and the inspector's reports forwarded to the Washington, N.C. office of the FCX Fruit Vegetable Service, Inc. All these shipments of potatoes, except the last 8 carloads shipped on 26 June, 1943, were invoiced to Farmers Cooperative Exchange, Washington, N.C. at the ceiling price of $2.84 and mailed, together with the bills of lading to Farmers Cooperative Exchange, Washington, N.C. The 8 cars shipped on 26 June, 1943, were invoiced to Farmers Cooperative Exchange, Washington, N.C. the car numbers given but no price designated, and mailed together with the bills of lading to the Farmers Cooperative Exchange, Washington, N.C.
In each of the bills of lading, the Farmers Cooperative Exchange is the consignor, the Farmers Cooperative Exchange is the consignee in 37 of the bills of lading and the destination Greenwich Yard, Pa. The Farmers Cooperative Exchange is the consignee in 35 additional bills of lading, destination Portsmouth, Ohio. The Atlantic Commission Co., c/o A. P. Tea Co., is consignee in 10 of the bills of lading, destination various points, while the Quarter Master Center, Nashville, Tenn., is consignee in 1, Greenburg Produce Co., Greenburg, Pa., is consignee in 2 and Kroger Grocery Baking Co., Toledo, Ohio, is consignee in 1. None of the shipments were rejected by the defendants or other consignees.
4. There is evidence to the effect that reference to both defendants, FCX Fruit Vegetable Service, Inc., and Farmers Cooperative Exchange, were frequently abbreviated by the letters "FCX," and that they had some common employees (but by no means all); that the FCX Fruit Vegetable Service, Inc., sold many of its deliveries to Farmers Cooperative Exchange; that on some occasions at height of season, remittance would be made from the Washington office by check of Farmers Cooperative Exchange, but the two companies were separate corporations engaged largely in different fields of activity. However, it *Page 634 
is admitted the Farmers Cooperative Exchange was incorporated for the purpose of purchasing supplies for farmers, such as feeds, seeds and fertilizer, and selling and marketing farm produce.
Nelson Ricks testified that he sold 9 cars of potatoes to the Farmers Cooperative Exchange in June and July, 1942, and the terms were cash f.o.b. Mt. Olive.
The evidence also discloses that the FCX Fruit Vegetable Service, Inc., is a small concern with a capital stock of $2,000.00, and has an estimated worth of $2,000.00; that all the stock is owned by the Farmers Cooperative Exchange, a corporation worth many thousands of dollars, and both corporations have the same directors.
5. The defendants deny any agreement or consent to waive the time of delivery of potatoes under the 1943 contract and deny that Whitehurst and Reaves requested an extension of the time. Testimony was offered to the effect that Whitehurst and Reaves on their visit to Washington, North Carolina, on 8 June, 1943, discussed only the possibility of reducing the handling charges from 5 to 4 cents per bag of potatoes and the grades that would be acceptable under the contract. Mr. Hilton testified that as to grade, he told them they would accept the inferior grades if other concerns accepted them, but as to a reduction in the handling charge he would have to consult others and advise them. He further testified that he did not authorize the use of the name of Farmers Cooperative Exchange in the bills of lading, but, on the contrary, when he received the first invoice and bills of lading he called Whitehurst over the telephone and instructed him to use the name of FCX Fruit Vegetable Service, Inc., as consignor and consignee unless otherwise instructed. Whitehurst testified that Hilton made no request to discontinue the use of the name of the Farmers Cooperative Exchange, in the bills of lading and invoices, but that he talked with Hilton and Pendulik many times daily during the shipping season and each shipment was made in accordance with the instructions given him by them.
6. The balance alleged to be due when this action was instituted was $57,549.13. The plaintiffs were indebted to defendants in the sum of $3,970.25 for potato bags, and the defendant FCX Fruit Vegetable Service, Inc., tendered checks to plaintiffs aggregating $14,154.84, the net balance due according to its contention. By agreement of counsel, plaintiffs accepted and cashed the above checks without prejudice to their claim for the balance of $39,424.04.
7. Prior to the institution of this action, the FCX Fruit Vegetable Service, Inc., remitted to Whitehurst and Reaves for 5 cars of potatoes at $2.84 per bag less $15.00 per car for handling, a total of $4,185.00, and on 24 June, 1943, Whitehurst and Reaves, by J. J. Whitehurst, drew a draft on Farmers Cooperative Vegetable Service, Washington, *Page 635 
N.C. for $5,000.00, and the FCX Fruit Vegetable Service, Inc., paid the draft by check on 28 June, 1943. Thereafter, on 29 June, 1943, J. J. Whitehurst drew a draft on Farmers Fruit Vegetable Exchange, Washington, N.C. and the FCX Fruit Vegetable Service, Inc., paid the draft on 1 July, 1943, by check, designating that it was in payment of Whitehurst and Reaves' draft.
8. The FCX Fruit Vegetable Service, Inc., set up a counterclaim against the plaintiffs, alleging J. J. Whitehurst did not ship to it all the potatoes grown by him in 1943. Plaintiffs offered evidence to the effect that all potatoes grown by J. J. Whitehurst in 1943 were shipped to the defendants.
At the conclusion of all the evidence, the defendants and each of them, renewed their motion for judgment of nonsuit. Motion denied and defendants except.
Issues were submitted to and answered by the jury, as follows:
"1. Did the plaintiff, J. J. Whitehurst, acting for himself and James Reaves, enter into a written contract with the defendant, FCX Fruit 
Vegetable Service, Inc., dated April 16, 1943, as alleged in the complaint? Answer: Yes.
"2. Did the defendant FCX Fruit Vegetable Service, Inc., waive the provisions of said written contract, as to the time of delivery, as to the number of cars of potatoes to be delivered, and as to the grade of potatoes delivered, as alleged in the complaint? Answer: Yes.
"3. Did the defendant, Farmers Cooperative Exchange, Fruit Vegetable Service, Inc., after the written contract was entered into, contract and agree to pay for the 86 carloads of potatoes as alleged in the complaint? Answer: Yes.
"4. Was the FCX Fruit Vegetable Service, Inc., at the time of said contracts and waivers, the duly authorized and acting agent of Farmers Cooperative Exchange (FCX), in making said contracts and waivers? Answer: Yes.
"5. In what amount, if any, is the defendant, FCX Fruit Vegetable Service, Inc., indebted to the plaintiffs? Answer: $20,000.00.
"6. In what amount, if any, is the defendant Farmers Cooperative Exchange, indebted to the plaintiffs? Answer: $20,000.00.
"7. In what amount, if any, is the defendant, FCX Fruit Vegetable Service, Inc., entitled to recover against J. J. Whitehurst on its counterclaim? Answer: None."
From judgment rendered on the verdict, defendants appeal to the Supreme Court, assigning error.
There are 113 exceptive assignments of error set forth in this record and obviously it would be impractical to discuss them seriatim.
Exceptions 1 to 35, and 37 to 49, inclusive, were taken during the introduction of testimony on the theory that parol evidence was inadmissible to amend, alter, vary or contradict a written contract, and therefore inadmissible. They present but one point and may be considered together.
A contract (except when forbidden by the statute of frauds) may be partly written and partly oral and in such cases the oral part of the agreement may be shown. Mfg. Co. v. McPhail, 181 N.C. 205,106 S.E. 672. However, it is the settled rule that a contemporaneous parol agreement is inadmissible to contradict that which is written.Insurance Co. v. Morehead, 209 N.C. 174, 183 S.E. 606; Miller v.Farmers Federation, 192 N.C. 144, 134 S.E. 407; Mfg. Co. v. McPhail,supra; Farquhar Co. v. Hardware Co., 174 N.C. 369, 93 S.E. 922;Cherokee County v. Meroney, 173 N.C. 653, 92 S.E. 616.
The exclusion of parol evidence on the theory that it is inadmissible to amend, vary or contradict a written instrument has no application to subsequent agreements which change or modify the original contract.Insurance Co. v. Morehead, supra; Grubb v. Motor Co., 209 N.C. 88,182 S.E. 730; Roebuck v. Carson, 196 N.C. 672, 146 S.E. 708; Lane v.Engineering Co., 183 N.C. 307, 111 S.E. 344; Mfg. Co. v. McPhail,supra; McKinney v. Matthews, 166 N.C. 576, 82 S.E. 1036; Freeman v.Bell, 150 N.C. 146, 62 S.E. 682.
The provisions of a written contract may be modified or waived by a subsequent parol agreement, or by conduct which naturally and justly leads the other party to believe the provisions of the contract are modified or waived. Mfg. Co. v. Lefkowitz, 204 N.C. 449, 168 S.E. 517; Bixler v.Britton, 192 N.C. 199, 134 S.E. 488. This principle has been sustained even where the instrument provides for any modification of the contract to be in writing. Allen v. Bank, 180 N.C. 608, 105 S.E. 401. It has likewise been sustained where a contract contained a provision to the effect that "No salesman or agent of the company shall have the right to change or modify this contract." Mfg. Co. v. Lefkowitz, supra.
We think the evidence relative to the extension of the time for delivery of the potatoes under the 1943 agreement, the number of cars to be shipped and the change in grade, was properly admitted. The defendants contend that the acceptance of potatoes from the plaintiffs after 20 June, 1943, has no bearing on the question of waiver as to time of delivery since, as they contend, they were compelled to accept all the potatoes tendered after that date under the terms of the 1941 agreement. *Page 637 
We do not so construe that agreement. That was a grower's contract and under its terms the FCX Fruit Vegetable Service, Inc., was not required to accept from J. J. Whitehurst any potatoes other than those grown by him. There is no evidence that Whitehurst grew more than a small proportion of the potatoes shipped by him and his partner, Reaves, in 1943, but, on the contrary, the defendants knew Whitehurst and Reaves were buying potatoes and paying the net ceiling price to the farmers of $2.70 per bag. Furthermore, the testimony of Mr. Hilton, manager of the defendant, FCX Fruit Vegetable Service, Inc., tends to confirm the contention of the plaintiffs that he agreed to waive the 1943 contract provision as to grade. These exceptions cannot be sustained.
The 36th and 50th exceptions are to the refusal of his Honor to grant the defendants' motions for judgment as of nonsuit at the close of plaintiffs' evidence and renewed at the close of all the evidence. The defendants are relying on the inadmissibility of parol evidence to modify the 1943 agreement, to sustain these exceptions, but in view of our decision relative to the admissibility of this testimony, these exceptions cannot be sustained on that ground. However, the defendant, Farmers Cooperative Exchange, Inc., urgently insists that the evidence, if admissible, is insufficient to sustain a verdict against it, and that its motion for judgment as of nonsuit should have been granted.
The mere fact that the Farmers Cooperative Exchange, Inc., owns all the capital stock of the FCX Fruit Vegetable Service, Inc., and the further fact that the members of the board of directors of both corporations are the same, nothing else appearing, is not sufficient to render the parent corporation liable for the contracts of its subsidiary. In order to establish liability on the part of the parent corporation on such contracts, there must be additional circumstances showing fraud, actual or constructive, or agency. 13 Am. Jur., sec. 1384, p. 1217. Here plaintiffs are relying on agency.
The evidence discloses that the plaintiff Whitehurst, under the grower's agreement of 1941, executed by him and the FCX Fruit Vegetable Service, Inc., invoiced potatoes during the 1941 and 1942 seasons to Farmers Cooperative Exchange, Washington, N.C. and that remittances on such invoices or in the payment of drafts on the Farmers Cooperative Exchange, Inc., were made by the FCX Fruit Vegetable Service, Inc. The evidence is in sharp conflict as to whether or not the plaintiffs were instructed by the defendants to make the shipments in 1943 in the name of the Farmers Cooperative Exchange, Inc., and in 72 instances to make them to it. The 1943 agreement, however, required the plaintiffs to make shipment to any destination requested by the Cooperative. There is evidence that all written communications from *Page 638 
FCX Fruit Vegetable Service, Inc., to plaintiff in 1943, were written on the stationery of the Farmers Cooperative Exchange, Inc., and that all invoices and bills of lading for the 86 cars of potatoes shipped by plaintiffs in 1943, were mailed to Farmers Cooperative Exchange, Inc., Washington, N.C. and that frequently both defendants were designated by the letters "F.C.X."; that they had some common employees and that on some occasions the Farmers Cooperative Exchange, Inc., remitted by its check for purchases made by the FCX Fruit Vegetable Service, Inc. Plaintiffs testified that Mr. Hilton was a common employee and that in dealing with them he had acted as agent for both defendants. Whatever may have been the relationship of the defendants to each other, it is not denied that the invoices and shipments were made as set forth in the statement of facts herein, and no shipment was rejected by the defendants or either of them. We do not think the exceptions to the failure to nonsuit the plaintiffs as to the defendant Farmers Cooperative Exchange, Inc., can be sustained. We think the evidence sufficient on the question of agency to warrant its submission to the jury.
Exceptions 51 to 70, inclusive, are abandoned — Rule 28, Rules of Practice in the Supreme Court, 221 N.C. 563.
The remaining exceptions are to the charge and to the refusal of the court to set the verdict aside and to the signing of the judgment.
We have carefully examined these exceptions and the argument of counsel in support thereof, but we think the charge contains no prejudicial error which would warrant a disturbance of the verdict below.
In the trial below, we find
No error.